**Mark D. WILSON; Janet L. Wilson, Appellants,**

v.

**UNITED STATES of America; The Boy Scouts of America, Appellees.**

**Mark D. WILSON; Janet L. Wilson, Plaintiffs,**

v.

**THE BOY SCOUTS OF AMERICA, Defendants.**

**Jason S. HARBIAN; Michael Harbian; Sharon Harbian; Daniel R. Winfrey, a Minor, by Susan Crump, his Mother and Next Friend, and; Susan Crump, Appellants,**

v.

**UNITED STATES of America; The Boy Scouts of America, Appellees.**

**Nos. 92–1438, 92–3363.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 18, 1992.

Decided March 29, 1993.

Rehearing Denied May 10, 1993 in No. 92–1438.

Allen DeWoskin (argued), St. Louis, MO, for appellants Mark and Janet Wilson.

Joseph Moore, Asst. U.S. Atty. (argued), St. Louis, MO, for appellee U.S.

Robert Cockerham (argued), St. Louis, MO, for the Boy Scouts of America.

Before HANSEN, Circuit Judge, and HEANEY and ROSS, Senior Circuit Judges.

ROSS, Senior Circuit Judge.

Appellants Mark Wilson and Janet Wilson, the parents of Anthony Wilson, and

Jason Harbian and Daniel Winfrey, and their parents, appeal from the trial court's[1] grant of summary judgment in favor of appellees United States of America and the Boy Scouts of America, in an action arising out of the death of Anthony Wilson and the injuries sustained by Jason Harbian and Daniel Winfrey.

On April 22, 1988, Anthony Wilson, Daniel Winfrey and Jason Harbian, members of Troop 392 of the Boy Scouts of America, St. Louis Area Council, along with other boy scouts and five adult leaders, went to Fort Leonard Wood, a United States Army military post, on a boy scout trip as part of the Army's Youth Tour Program. A pile of lightweight aluminum alloy irrigation pipes, approximately thirty feet in length, were stacked outside Building 1614, where the troop was billeted for the weekend. The pipes had been used for irrigation of the athletic field adjacent to the building, and when not in use, were stored alongside the building. The pipes had been stacked in this manner for approximately six years.

On the second night of their weekend stay, at approximately 10:30 p.m., Anthony, age thirteen, and five or six other scouts, ages twelve to sixteen, were outside Building 1614, while the leaders were inside the building. Anthony, Daniel and Jason picked up one of the aluminum pipes, carried it approximately twenty feet west of the building, and raised it to a near vertical position, causing the pipe to come in contact with a 7,200 volt power line which ran over the building. All three scouts received electric shocks; Anthony died as a result of the injuries he sustained.

Mark and Janet Wilson brought a wrongful death action against the United States pursuant to the Federal Tort Claims Act, and against the Boy Scouts of America (BSA) pursuant to Missouri state law, for negligent supervision and failure to train the adult supervisors. Sometime later the Harbian/Winfrey plaintiffs filed personal injury actions against both the United States and the BSA, and eventually these cases were consolidated with the *Wilson* case for trial. Motions for summary judgment filed by the United States and the BSA were eventually granted as against all appellants.[2]

The appellants' theory of recovery against the BSA is based on an alleged agency relationship between the BSA and the adult volunteers supervising the scouts. The district court granted the BSA's motion for summary judgment, concluding that appellants failed to produce any evidence that the national organization of the BSA had a duty to control, supervise or train volunteer leaders for the Fort Leonard Wood activity. The district court also granted the United States' motion for summary judgment based on its finding that the United States owed no duty of care to the scouts because they were recreational users of the property under Missouri's Recreational Land Use Statute. *See* Mo.Rev. Stat. § 537.346. After careful consideration of each allegation raised by the appellants, we affirm the decision of the district court.

### I. *United States of America*

The action against the United States arises under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2680, thus, the "United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances." *Id.* at § 2674. Further, the United States is "entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States ... as well as any other defenses to which the United States is entitled." *Id.* Therefore, the United States is entitled to

---

1. The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

2. On December 4, 1992, following oral argument of the *Wilson* appeal before this court, the *Harbian* and *Winfrey* cases were consolidated with the *Wilson* appeal. All parties agree that these cases arose from the same occurrence and are identical in material fact and law. The Harbians and the Winfreys rely on the briefs and oral argument submitted in the *Wilson* appeal. The Wilsons, Harbians and Winfreys will be collectively referred to as "appellants."

the benefit of state recreational use statutes, if applicable, when it is sued under the Federal Tort Claims Act. *See Hegg v. United States*, 817 F.2d 1328, 1329 (8th Cir.1987) (construing the Iowa Recreational Use Statute); *Umpleby v. United States*, 806 F.2d 812, 815 (8th Cir.1986) (applying North Dakota's Recreational Use Statute).

The Missouri Recreational Land Use Statute, Mo.Rev.Stat. §§ 537.345–537.348 immunizes landowners who make their property available for the recreational use of others without an entry charge. The statute specifically provides:

> Except as provided in sections 537.345 to 537.348, an owner of land owes no duty of care to any person who enters on the land without charge to keep his land safe for recreational use or to give any general or specific warning with respect to any natural or artificial condition, structure, or personal property thereon.

*Id.* at § 537.346. "Charge" is defined in the statute as:

> the admission price or fee asked by an owner of land or an invitation or permission without price or fee to use land for recreational purposes when such invitation or permission is given for the purpose of sales promotion, advertising or public goodwill in fostering business purposes.

*Id.* at § 537.345(1). "Recreational use" as defined in the statute includes outdoor activities, such as "hunting, fishing, camping, picnicking, biking, nature study [and] winter sports." *Id.* at § 537.345(4).

While providing for a general immunity against liability, a landowner may nonetheless be liable if found to have been either maliciously or grossly negligent in failing to guard or warn against a dangerous condition which the owner knew or should have known to be dangerous, or if the landowner negligently failed to warn or guard against an ultrahazardous condition. *Id.* at § 537.348(1). Other exceptions to the nonliability of the statute include injuries occurring on or in any "noncovered land," which is defined as land used primarily for commercial, industrial or manufacturing purposes. *Id.* at § 537.348(3)(d).

█ ] The appellants contend that the Missouri Recreational Land Use Statute does not apply to the United States because (1) the Army charged $2.00 per person to be billeted in Building 1614; (2) the United States receives an economic benefit from offering its land; (3) the Boy Scouts were not members of the "general public," and thus were not covered by the Act; (4) the injury occurred on "noncovered land;" and (5) the United States negligently failed to protect against an ultrahazardous condition.

### A.

Fort Leonard Wood is an open military post, where members of the public can freely enter without being stopped or questioned by guards or military police. Specified areas are open to the public for fishing, hunting, hiking, camping, picnicking or canoeing. Many tours are given to various groups, such as senior citizens and church and school groups, free of charge. The Fort also offers a Youth Tour Program which is open only to national youth organizations, such as the Boy Scouts of America. The program includes activities which are not available to the general public, such as visits to the Fort's museum, an indoor rifle range, and obstacle course and a cannon range.

If a troop in the Youth Tour Program chooses to stay overnight in Building 1614, a $2.00 per person/per night lodging fee is charged. This fee covers the cost of maintaining and equipping the facility with mattresses, toilet paper, soap, and other supplies. If a troop chooses to stay overnight but no beds are available, the lodging fee is reduced to $1.00 per person/per night. Significantly, the lodging fee is charged on a per person/per night basis, while there is no charge for the tour itself, which is offered only on Saturdays.

The interpretation of the various recreational use statutes is controlled by the precise language of each statute. Courts that have construed recreational land use statutes with language similar to the Missouri statute have interpreted "charge" as

"an admission fee to enter the land." For example, in *Genco v. Connecticut Light and Power Co.*, 7 Conn.App. 164, 508 A.2d 58, 62 (1986), noting that the Connecticut General Statute § 52–557f defines "charge" as "the admission price or fee asked in return for invitation or permission to enter or go upon the land," the court held that "the only way to avoid inconsistent application of the Act ... is to interpret the word 'charge' as *an actual admission price paid for permission to enter the land* at the time of its use for recreational purposes." *Id.* (emphasis added).

Furthermore, a parking fee paid by a camper is not a charge within the meaning of the Nebraska Recreational Use Statute, which defines "charge" as "the amount of money asked in return for *an invitation to enter or go upon the land."* *Garreans v. City of Omaha*, 216 Neb. 487, 345 N.W.2d 309, 313 (1984) (emphasis added). In *Garreans*, the court noted that the

> [c]harges were made for the right to park a camper on a pad, for the right to pitch a tent in a tent camping area, and for the use of camper dumping facilities. Payment of the fee ... did not entitle ... [the person paying the fee] to a greater right to use any of the park's other facilities than that had by the general public.

*Id.*

As in *Jones v. United States*, 693 F.2d 1299, 1303 (9th Cir.1982), where a one dollar fee was charged the injured plaintiff to rent an inner tube for snow sliding, the fee paid by the scouts to bunk in Building 1614 was not "charged to members of the public for entry on to the land or for use of the land." *Id.* Rather, the scouts paid the $2.00 fee to bunk in Building 1614, but entered the park without paying a fee. The *Jones* court held that the plaintiff "could have used ... the Park without making any payment if she had brought her own tube." *Id.* Similarly, the appellants could have used Fort Leonard Wood without making this $2.00 payment if they had chosen not to stay overnight. The Missouri statute does not provide that the immunity for an entire parcel should be nullified if a landowner charges for admis-

sion to a different portion of the parcel, nor would such a rule be consistent with the statute's purpose. "Consideration should not be deemed given ... unless it is a charge necessary to *utilize the overall benefits of a recreational area* so that it may be regarded as an entrance or admission fee." *Moss v. Department of Natural Resources*, 62 Ohio St.2d 138, 404 N.E.2d 742, 745 (1980) (emphasis added).

The appellants herein paid $2.00 per night for the right to stay overnight in Building 1614. There is no evidence in the record to indicate that this fee would have been charged to either participate in the Youth Tour Program, or to enter Fort Leonard Wood, if the scouts had elected not to stay overnight. In fact, all of the Fort Leonard Wood documents relating to this fee provide that it is a "lodging" fee and that it is assessed on a per person/per night basis. The appellants have failed to present any evidence that the fee was required in order to enter Fort Leonard Wood.

### B.

■ The remainder of appellants' arguments with regard to the liability of the United States are also without merit. The appellants contend that the United States is outside the protection of the Missouri Recreational Land Use Statute because the scouts are not "members of the general public." They contend that because only members of national youth organizations are eligible to participate in the Youth Tour Program, the scouts should be treated as guests or invitees. Appellants' argument, however, relies upon a distinction not made within the language of the Missouri Recreational Land Use Statute. The plain language of the statute indicates that a landowner owes no duty of care *"to any person* who enters on the land without charge" for recreational purposes. Mo. Rev.Stat. § 537.346 (emphasis added).

■ We also reject the appellants' argument that the United States is outside the protection of the Missouri statute because the Army's purpose in allowing admission to Fort Leonard Wood is to develop public

goodwill in fostering a business purpose. *See* Mo.Rev.Stat. § 537.345(1). When Boy Scout troops visit the Fort, they are not recruited or encouraged in any way to join the Army, nor are any records kept of scouts who have participated in the Youth Tour Program. Further, appellants have failed to establish that the Army operates as a business within the intended meaning of the statute.

 Finally, appellants' argument that Building 1614 was essentially a commercial "hotel" located in a "populated, residential area," and therefore falls within the "non-covered land" exception of section 537.-348(3)(d) is without merit. The record does not support appellants' contention that the Fort was "predominately used for residential purposes," nor that Building 1614 was operated as a commercial enterprise. Nor can we accept appellants' argument that the United States acted with willful and wanton disregard for the safety of the troops or negligently failed to protect them against an ultrahazardous condition. There simply has been no evidence presented to establish either of these theories.

The judgment of the district court granting summary judgment in favor of the United States is affirmed.

## II. *Boy Scouts of America*

The appellants also challenge the district court's grant of summary judgment in favor of the Boy Scouts of America. The appellants contend there is a genuine issue of material fact as to whether an agency relationship existed between the BSA and the adult volunteers of Troop 392 so as to provide for vicarious liability for any negligence on the part of the adult leaders. The appellants claim the BSA had the right to control and supervise Troop 392's adults, that the BSA is liable for the negligent acts of the troop's adult leaders which were committed within the scope and course of their agency relationship, and further that the troop's adult leaders were clothed with implied and apparent authority to act on behalf of the BSA when they were present at Fort Leonard Wood.

 The appellants first argue that the district court improperly considered the affidavit of Lloyd Roitstein, Area Director in the North Central Region of the Boy Scouts of America, in considering the relationship between the national organization and the individual troops because the affidavit was not based on personal knowledge. We agree with the district court that Roitstein's role as an Area Director establishes his personal familiarity with the Boy Scout organization and conclude that the affidavit was properly considered.

The Boy Scouts of America is a congressionally chartered benevolent national organization, which is divided into geographic areas known as local councils. Three hundred ninety-eight local councils are chartered in the United States. Local sponsors, such as schools, churches or civic organizations apply for charters from the BSA through their local council. Local volunteers form a patrol leaders' council to plan troop activities. BSA does not conduct or require any training for these adult volunteers. Troops do not need permission from BSA before participating in activities, with the exception of tours outside the United States or five hundred miles or more from the local council. The BSA had no advanced notice of Troop 392's trip to Fort Leonard Wood. The troop was not required, nor did it receive, permission from the BSA to go to Fort Leonard Wood.

 Under the doctrine of respondeat superior an employer is liable for the negligent acts or omissions of his employee which are committed within the scope of his employment. *Light v. Lang,* 539 S.W.2d 795, 799 (Mo.Ct.App.1976). Liability based on respondeat superior requires some evidence that a master-servant relationship existed between the parties. *Usrey v. Dr. Pepper Bottling Co.,* 385 S.W.2d 335, 338 (Mo.Ct.App.1964). The test to determine if respondeat superior applies is whether the person sought to be charged as a master had "the right or power to control and direct the physical conduct of the other in the performance of the act." *Id.* at 339. If there is no right to control, there is no liability.

 Courts of other jurisdictions that have addressed the issue now before this court have rejected the imposition of liability against the BSA or the local councils,

noting the lack of control these entities exercise over individual troops and their sponsoring organizations. For example, in *Mauch v. Kissling*, 56 Wash.App. 312, 783 P.2d 601 (1989), the court found there was no basis for the doctrine of apparent authority because the plaintiff had not presented evidence that BSA consented to or had control of the scoutmaster's activities. *Id.* 783 P.2d at 605.

Similarly, in *Anderson v. Boy Scouts of America, Inc.*, 226 Ill.App.3d 440, 168 Ill. Dec. 492, 589 N.E.2d 892 (1992), the court found the plaintiffs had failed to establish that an agency relationship existed between the plaintiffs and the local council or the BSA:

> We find no provisions in the charter, bylaws, rules and regulations promulgated by the BSA, nor can plaintiffs cite to any provisions within these documents, which specifically grant BSA or its district councils direct supervisory powers over the method or manner in which adult volunteer scout leaders accomplish their tasks.

*Id.* 168 Ill.Dec. at 494–95, 589 N.E.2d at 894–95.

Recently, the Missouri Court of Appeals considered the Wilson's cause of action against the St. Louis Area Council of the Boy Scouts of America, arising from the same circumstances of the instant case. The Missouri court dismissed the suit against the local council, finding that "Council neither controlled the actions of the troop leaders nor ran the program at Fort Leonard Wood." While the Missouri state court decision involved the local council, it is instructional here because the relationship between the national organization and the individual troop leaders is even more remote.

Appellants also contend that sufficient facts establish a jury question as to whether a principal/agent relationship existed under a theory of implied agency or apparent authority. Implied agency and apparent authority, however, are based on manifestations by the principal which causes a third person reasonably to believe that an agent of the principal is authorized to do certain acts. *Barton v. Snellson*, 735 S.W.2d 160, 162 (Mo.Ct.App.1987). Appellants contend the use of common uniforms, emblems, books and awards in the scouting program, a national insurance program, issuance of the national membership card and other printed materials locally, as well as other indicia of a relationship between BSA and the local council, create a manifestation of authority upon which an innocent third party might reasonably rely.

Appellants fail, however, to produce any evidence that BSA manifested that it had direct control over the specific activities of individual troops or that it had a duty to control, supervise or train volunteer leaders for the Fort Leonard Wood activity. On the contrary, the Boy Scout Handbook clearly provides, "[w]hat the troop does is planned by the patrol leaders' council." The organizational structure of the BSA leaves the control of the specific activities at the level closest to the individual troop. Appellants have produced no direct or circumstantial evidence to suggest that in this case BSA manifested control.

In summary, we conclude that the district court properly granted summary judgment in favor of the Boy Scouts of America and the United States. The judgment of the district court is affirmed.